ADAMS, J.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BONITA CHAVIS, | ) | CASE NO. 5:06CV2455 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | ORDER |
| PROGRESSIVE STEP CORP., | ) | [RESOLVING DOC. 18] |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on Defendant Progressive Step Corp.'s Motion for Partial Summary Judgment.[1] This Court has been advised, having reviewed the parties' pleadings, motions, oppositions, replies, attached exhibits, and applicable law. For the reasons that follow, this Court orders that Defendant's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.

**I. Statement of Facts**

Defendant is a Delaware Corporation that provides rehabilitation therapy to patients in a variety of nursing homes and assisted living facilities. Plaintiff Bonita Chavis, an African American woman, was hired by Defendant on April 11, 2003 as an occupational therapist to provide services at a health care facility called The Arbors at Fairlawn ("The Arbors"), which is located in Fairlawn, Ohio. While working at The Arbors, Chavis was assigned to provide physical therapy services to various patients.

[1] Plaintiff's only remaining claim is Count 7, infliction of emotional distress. This claim was not addressed in Defendant's Motion for Summary Judgment.

On March 8, 2005, Chavis was assigned to assist one patient, Robert Juda, care for himself by helping him perform some personal hygiene. (Chavis Dep. at 124-25). Juda shared a room with another patient, Vernon Barnhart. (Id.). Chavis was acquainted with Barnhart because she had provided care to him in the past. (Id. at 123). Barnhart had a reputation of being a difficult resident. (Ottman Dep. at 16; Vines Dep. at 16-18). For example, when Chavis was working with Barnhart in the past, he would often call her "bitch" and despite asking him to stop, he persisted. (Chavis Dep. at 126). Pierre Vines, the Facility Rehabilitation Coordinator and Chavis' immediate supervisor, was aware that Barnhart had used derogatory and offensive language with a "racist slant" towards African Americans. (Vines Dep. at 19). Although Barnhart was offensive to everyone at The Arbors, he was particularly rude to African Americans and appears to have had some kind of personal conflict with just Chavis. (Chavis Dep. at 122; Ottman Dep. Ex. 4[2]). Barnhart also claimed to be a member of the Aryan Nation and made comments such as wishing Chavis a "Happy James Earl Ray Day" on Martin Luther King, Jr. Day. (Ottman Dep. Ex. 5[3]).

When Chavis arrived to help Juda, Barnhart called Chavis a "bitch" or a similar remark. (Chavis Dep. at 125-26). Apparently this was not unusual as Barnhart regularly made these types of comments during the two to three months he had been at Arbors. Chavis ignored the initial comment and proceeded to help Juda clean himself in the bathroom attached to the room.

[2]Some of the facts surrounding this incident are derived from various exhibits that were attached to the Ottman deposition. These exhibits include the statements and reports that were compiled during the internal investigation into this matter. Ottman Deposition Exhibit 4 is a handwritten report from Monica Herbeth which purports to be her summary of an interview that she had with Barnhart. This exhibit, like many others that Plaintiff relies on, is not sworn testimony in the form of an affidavit or deposition like Fed. R. Civ. P. 56(e) requires. However, Defendant did not object to Plaintiff citing to this exhibit for support.

[3] This is another exhibit from the Ottman Deposition. It appears to be Chavis's own written statement that may have been prepared for the internal investigation that gives her version of the incident. Again, this exhibit is not in the form of sworn testimony and Defendant has not objected to its use.

(Chavis Dep. at 125-28). While Chavis was attending to Juda, Barnhart continued to make remarks directed to Chavis, but she ignored him. (Chavis Dep. at 128). Chavis then stepped out of the restroom to place Juda's dirty clothing in his laundry hamper. (Chavis Dep. at 127-28). Not knowing which laundry hamper belonged to Juda, Chavis asked Barnhart. (Chavis Dep. at 128-29). It was at this point when Barnhart called Chavis a "f****** black bitch" and a "f****** black n*****." (Chavis Dep. at 129). Chavis had tolerated all of Barnhart's remarks up to this point, but when he used "n*****," Chavis confronted him. (Chavis Dep. at 129, 132).

When Chavis approached Barnhart's bed, Barnhart swung at her face with his hand. (Chavis Dep. at 135-36). To protect herself, Chavis put up her own hands and caught his wrist before he was able to make contact with her body. (Chavis Dep. at 135-36). Chavis reprimanded Barnhart for trying to hit her, let go of his wrist, and started to walk away. (Chavis Dep. at 138-39). As she was walking away, Barnhart told Chavis "to go to hell," which she responded to by saying "[t]hat's where you'll be if you don't accept Christ as your personal savior." (Chavis Dep. at 138-39). Chavis finished up with Juda as Barnhart continued to make remarks about Hitler and threatened to report Chavis for abusing him. (Chavis Dep. at 139).

Shortly after this incident, Barnhart asked to speak with Vines. (Vines Dep. at 21-23). Vines spoke with Barnhart at which time he told Vines that he had been abused by Chavis. (Vines Dep. at 22-23). Vines gathered as much information as possible from Barnhart who admitted to calling Chavis a "n*****" and admitted to taking a swing at her. (Vines Dep. at 30, Ex. 2). Vines passed along his preliminary findings to the director of nursing, Cindy Elliott, and the administrator, Monica Herberth, who would perform a full investigation. (Vines Dep. at 23-24). Vines then spoke with Chavis to get her statement. (Vines Dep. at 24, 31). Barnhart was

also examined after this incident and there were no findings of bruises or any other physical markings. (Ottman Dep. at 52). After his preliminary investigation, Vines concluded that Barnhart and Chavis had acted inappropriately. (Vines Dep. at 34).

Chavis then met with the management personnel (Elliott and Herberth) to give her version of the event. (Chavis Dep. at 148). After giving her statement and while the investigation was pending, Chavis was suspended pursuant to company policy. (Vines Dep. at 25-26). After reviewing the matter, Alison Ottman, Regional Director of Rehabilitation, concluded that Chavis violated the Defendant's written policy against abusing its patients and terminated her employment effective March 10, 2005. (Ottman Aff. at ¶¶ 5, 20). Specifically, the employee manual provided to Chavis reads as follows:

> An employee will be discharged if an investigation reveals they have committed a Class III infraction. Other offenses may also merit discharge. Class III examples include, but are not limited to:
>
> 1. Verbal, mental, physical, or sexual abuse of any resident/patient of the facility ... or neglect or mistreatment of any resident/patient of the facility.

In addition, Chavis signed a document titled "Extendicare Policy Prohibiting Abuse, Neglect, Misappropriation." That document reads as follows:

> Extendicare will not employ individuals who have been found to have engaged in abuse, neglect or mistreatment of residents, or to have misappropriated resident property.
>
> Abuse means the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish.

Ottman admitted that she reached the decision to terminate Chavis even though she thought that it was appropriate for Chavis to be angry with Barnhart and that it was appropriate

for Chavis to tell Barnhart not to call her a "n*****." (Ottman Dep. at 77). Vines, as Chavis' immediate supervisor, did not participate in the decision to terminate Chavis, even though he typically was consulted in such matters. (Vines Dep. at 26-27). Ottman did not consider Chavis' length of employment in her profession before deciding to terminate her. (Ottman Dep. at 77-78). Chavis was replaced by a white female within a few months of this incident. (Ottman Dep. at 82). Barnhart passed away before the initiation of this lawsuit.

Defendant also has a policy that is designed to provide employees with a working environment free from harassing or otherwise offensive behavior. (Ottman Aff. at ¶ 6). According to the policy, employees experiencing offensive behavior must report it to their supervisor so that it can be investigated and appropriate actions taken. (Ottman Aff. at ¶ 6). Vines testified that Chavis had a wide range of options available to her to avoid contact with Barnhart. (Vines Dep. at 34-38). Chavis could have worked with Juda in another room or she could have had her occupational therapist assistant work with Juda in his room or she simply could have avoided speaking with Barnhart. (*Id.*). These were all practicable options for Chavis to consider. (Vines Dep. at 36-37). Although her supervisors had spoken to her about some minor incidents, Chavis was considered a good employee as she had good clinical skills and good relationships with her patients. (Ottman Dep. at 12; Vines Dep. at 8; Chavis Dep. at 86-87).

**II. Procedural History**

Chavis filed the instant action in the Summit County Court of Common Pleas. She named Progressive Step, Alison Ottman, Monica Herberth, and the Arbors of Fairlawn as Defendants. Ultimately, Chavis voluntarily dismissed Ottman, Herberth, and the Arbors of

Fairlawn. Progressive Step, as the sole remaining Defendant, removed the action based on diversity.

Chavis' complaint originally alleged eight (8) different Counts. However, during the course of litigation Counts 3, 4, 5, and 6 have been dismissed. In Counts 1 and 2, Chavis alleges racial discrimination in violation of Ohio R.C. §§ 4112.02 and 4112.99. In Count 7, Chavis alleges a state law claim of intentional infliction of emotional distress. Finally, Count 8 is a stand-alone demand for punitive damages. Defendant has moved for summary judgment on Counts 1, 2, and 8, but has not addressed Count 7.

**III. Legal Standard**

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56©. The burden of showing the absence of any "genuine issues" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56©).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (quoting Fed. R. Civ. P. 56©). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens. *Id.* at 252. A court must view the summary judgment motion "in the light

most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). *See also U.S. v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985).

Summary judgment should be granted if the party who bears the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Moreover, if the evidence is "merely colorable" and not "significantly probative," a court may decide the legal issue and grant summary judgment. *Id.* at 249-50 (citation omitted). In most civil cases involving summary judgment, a court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving] party is entitled to a verdict." *Id.* at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Fed. R. Civ. P. 56(e)(2) states:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has held that "it is well

settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Wiley v. U.S.*, 20 F.3d 222, 225 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Fed. R. Civ. P. 56(e)(1) sets forth more specific requirements:

> [It] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26.

As a general matter, the district court considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial. *Id.* This does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* In sum, proper summary judgment analysis asks whether a trial is necessary. Summary judgment is appropriate where there are no genuine issues of fact. *Id.* at 250.

**IV. Law and Analysis**

1. <u>Chavis' Disparate Impact Claim</u>

When a facially neutral policy is applied in such a manner that results in discriminatory consequences to members of a protected class, the policy is said to produce a "disparate impact" upon the affected individuals. *Little Forest Med. Ctr. Of Akron v. Ohio Civ. Rights Comm'n*, 575

N.E.2d 1164, 1168 (Ohio 1991). In disparate impact cases, proving discriminatory motive is not necessary. *Id.* The plaintiff has the burden to establish that the employer has adopted a specific policy which adversely affects members of a protected class. *Id.* The plaintiff must identify the specific employment practice that is allegedly responsible for any observed statistical disparity. *Albaugh v. City of Columbus, Div. of Police*, 725 N.E.2d 719, 724 (Ohio Ct. App. 1999). Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer sufficient statistical disparities, rather than specific incidents, showing that the practice in question has caused the alleged discrimination. *Id.* Once the plaintiff has set forth her prima facie case, the defendant-employer then has the burden to show a business justification for the practice. *Id.* Once the defendant-employer makes this showing, the plaintiff has the opportunity to show that another policy, without a similarly undesirable effect, would also equally serve the employer's legitimate business interests. *Id.*

Chavis complains of Defendant's policy which prohibits the abuse, neglect, or mistreatment of its residents. Chavis argues that strict enforcement of this policy adversely affects *only* African American employees, but offers no support for this contention. Specifically, Chavis appears to argue that only African Americans could be subject to racially derogatory speech and react in an angry manner , a patently unfounded assertion. Furthermore, Chavis does not offer any statistical evidence showing that this "no abuse" policy was enforced disproportionately against African Americans. Since Chavis has offered no evidence to show that this policy disproportionately affects African Americans, her disparate impact claim must fail as a matter of law. Defendant, therefore, is entitled to summary judgment on this claim.

2. <u>Chavis' Disparate Treatment Claim</u>

Disparate treatment occurs when an employer treats an employee less favorably than others because of her race, color, or other protected characteristic. *Albaugh*, 725 N.E.2d at 723. The plaintiff bears the burden of establishing a discriminatory motive. *Little Forest Med. Ctr.*, 575 N.E.2d at 1168. To establish a claim of disparate treatment, the plaintiff has the burden of proving a prima facie case of racial discrimination. *Starner v. Guardian Indus.*, 758 N.E.2d 270, 277 (Ohio Ct. App. 2001). A plaintiff can establish a prima facie case of discrimination by showing that 1) she belongs to a protected class, 2) she was qualified for the position, 3) she was terminated despite her qualifications, and 4) she was replaced by someone outside the protected class. *Smith v. Goodwill Indus. of the Miami Valley, Inc.*, 720 N.E.2d 203, 206 (Ohio Ct. App. 1998). If the plaintiff establishes a prima facie case, the burden shifts to the defendant-employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* For this showing, the burden is one of production, not persuasion, and involves no assessment of credibility. *Carney v. Cleveland Heights-Univ. Heights City Sch. Dist.*, 758 N.E.2d 234, 245 (Ohio Ct. App. 2001).

After the defendant-employer offers such a reason, the plaintiff must then show that the defendant-employer's proffered reason is merely a pretext for discrimination. *Smith,* 720 N.E.2d at 206. The plaintiff may establish pretext by showing that 1) there was no basis in fact for the justification given, 2) the justification did not actually motivate the discharge, or 3) the justification was insufficient to motivate the discharge. *Basinger v. Pilarczyk*, 738 N.E.2d 814, 816 (Ohio Ct. App. 2000).

There is no dispute that Chavis as an African American is a member of a protected class. There is also no dispute that Chavis was qualified for her job. Both Ottman and Chavis'

immediate supervisor, Vines, testified that Chavis was qualified and was doing a good job, therefore satisfying the second element of her prima facie case. (Ottman Dep. at 12; Vines Dep. at 7-8). Chavis satisfies the third element because she suffered an adverse employment decision by virtue of her termination. (Ottman Aff. at ¶20). Finally, within a few months of her termination, Chavis was replaced by a white employee, satisfying the final prong of her prima facie case of discrimination. (Ottman Dep. at 82). Since Chavis has established a prima facie case of racial discrimination, the burden now shifts to Defendant to articulate some legitimate, business reason for its decision to terminate Chavis.

Defendant has a policy that prohibits its employees from abusing and neglecting its patients. (Ottman Aff. at ¶5). Defendant maintains that it terminated Chavis for violating this "no abuse" policy. (Ottman Aff. at ¶¶5, 16, 20). Defendant asserts that Chavis violated the policy when she approached Barnhart and grabbed his wrist to stop him from hitting her. (Ottman Aff. at ¶ 19-20; Chavis Dep. at 135-36). Specifically, Defendant concluded that Chavis had unreasonably confined Barnhart when she "grabbed his arm . . . . so tight he could not pull away." (Ottman Dep. at 52). Since Defendant has articulated a legitimate, non-discriminatory business reason for its decision to terminate Chavis, the burden now shifts back to Chavis to show pretext.

Chavis argues that Defendant's reason for her termination has no basis in fact. Chavis indicates that the "no abuse" policy defines abuse as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish." (Ottman Aff. at Exhibit A). Chavis argues that she did not abuse Barnhart within the meaning of this policy. Specifically, Chavis indicates that Barnhart did not suffer any

physical harm or pain because there were no resulting bruises on his body. (Ottman Dep. at 52). Chavis also indicates that there was no evidence that Barnhart suffered any mental anguish. (Ottman Dep. at 51-52).

To show pretext, Chavis must come forward with "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant ... did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)(citations and quotations omitted). An employer acts with an honest belief when the employer establishes reasonable reliance on the particularized facts that were before it at the time the adverse decision was made. *Id.* This Court finds that Chavis has provided sufficient evidence from which a jury could reasonably reject the reason given for her termination. Chavis admits that she approached Barnhart on her own volition and grabbed his wrist as he swung at her. Chavis, therefore, admits that there exists a factual underpinning for her termination. However, there is little question that Chavis' physical contact with Barnhart was an act of self-defense. Her uncontradicted testimony indicated that she grabbed Barnhart's arm only after he attempted to strike her. Moreover, a full investigation into this incident did not reveal that Barnhart suffered any physical injury or mental anguish as a result of Chavis' action. Ottman concluded, among other things, that grabbing and holding Barnhart's wrist constituted "unreasonable confinement" and discharged Chavis pursuant to the no abuse policy. However, as detailed above, Chavis' actions were limited to defending herself, were short in duration, and resulted in no injury to Barnhart. A reasonable jury, therefore, could reject the reason given for Chavis' termination.

Consequently, Chavis has demonstrated that a genuine issue of material fact exists over whether her termination was a pretext for discrimination. As a result, Defendant is not entitled to summary judgment on Chavis' claim of disparate treatment.

3. Chavis' Hostile Work Environment Claim

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Ohio courts generally apply federal case law interpreting Title VII of the Civil Rights Act when analyzing violations of R.C. §4112. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm.*, 421 N.E.2d 128, 131 (Ohio 1981). The conduct complained of must be both severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive and the plaintiff must subjectively regard that environment as abusive. *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000). In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Appropriate factors for a court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bowman*, 220 F.2d at 463. The conduct must be sufficiently "extreme to amount to a change in the terms and conditions of employment." *Lovelace v. BP Prod. N. Am., Inc.* 252 Fed. Appx. 33, 40 (6th Cir. 2007). "'[M]ere utterance of an ... epithet which engenders offensive feelings in a employee,'

does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

To establish a claim based on a racially hostile work environment, a plaintiff must establish that 1) she was a member of a protected class, 2) she was subjected to unwelcome racial harassment, 3) the harassment complained of was based on race, and 4) the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment. *Lovelace*, 252 Fed. Appx. at 39.

Chavis has failed to produce any evidence indicating that the harassment she was subjected to interfered with her work performance. Chavis readily admits that she has been trained to deal with offensive patients and that Barnhart's outbursts did not prevent her from doing her job. (Chavis Dep. at 101). In addition, Chavis' own actions show that she was not prevented from doing her job. After the confrontation with Barnhart, Chavis walked away and continued working with Juda, despite further comments from Barnhart. (Chavis Dep. at 139). Moreover, Chavis claim focuses on a single patient who had only been at the facility for two to three months. While disparaging and highly inappropriate, Barnhart's isolated, racially motivated comments do not give rise to a severe and pervasive environment of racial discrimination that effected Chavis' ability to perform her job functions. Chavis, therefore, has failed to establish the fourth element for a prima facie case of hostile work environment and therefore her claim must fail as a matter of law. Accordingly, Defendant is entitled to summary judgment on this claim.

4. <u>Chavis' Claim for Lost Wages and Punitive Damages</u>

Defendant asserts that Chavis' actions following her termination demonstrate that she failed to mitigate her damages. Generally, "the adequacy of mitigation is a question of fact[.]" *Summit Petroleum Corp. Of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990). In the instant matter, Chavis did not immediately find work following her termination and subsequently accepted part-time work. She then relocated and again found part-time work several months later. Due to the fact intensive inquiry surrounding the adequacy of mitigation, this matter must be resolved by a jury.

A plaintiff who proves a cause of action for racial discrimination may recover punitive damages only under circumstances where the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Beauford v. Sisters of Mercy-Province of Detroit, Inc.*, 816 F.2d 1104, 1108-09 (6th Cir. 1987)(quoting *Smith v. Wade*, 461 U.S. 30, 56). The imposition of punitive damages in civil rights actions has generally been limited to cases involving egregious conduct or a showing of willfulness or malice on the part of the defendant. *Wolfel v. Bates*, 707 F.2d 932, 934 (6th Cir.1983). As detailed above, Chavis has generated a genuine issue of material fact regarding the reason she was terminated. A reasonable jury, therefore, could conclude that Defendant's actions were taken with an evil intent. The issue of punitive damages, therefore, must be resolved by a jury.

**V. CONCLUSION**

Chavis' disparate impact claim fails because she has not produced any statistical evidence showing that Defendant's policy adversely affects African-Americans. Chavis' hostile work environment claim fails because by her own admission any alleged harassment did not

adversely affect her work performance. However, a genuine issue of material fact remains on Chavis' claim of disparate treatment and the damages associated with that claim. Therefore, Defendant's motion is hereby GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED: April 11, 2008

*/s/ John R. Adams*
UNITED STATES DISTRICT JUDGE